IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| IN RE: | MARK F. WHITE and<br>NNIKA E. WHITE, | Case No. 14-36232-KRH<br>Chapter 7 |
| | Debtors. | |

**MEMORANDUM OPINION**

On November 4, 2015, the Court conducted an evidentiary hearing (the "November Hearing") (i) on an Order for Nnika E. White ("White") in her capacity as counsel for the Debtors to Show Cause why she should not be sanctioned for her conduct in this case (the "Order to Show Cause") and (ii) on a Motion filed by the Chapter 13 Trustee (the "Motion") to convert the Debtors' Chapter 13 Case to one under Chapter 7 of the Bankruptcy Code.[1] After considering the evidence presented during the November Hearing in the context of the applicable statutory authority, the case law, the pleadings, and the arguments of counsel, the Court found that the Debtors' bad faith conduct in their Chapter 13 Case was prejudicial to their creditors. Accordingly, the Court entered an order converting the Debtors' Chapter 13 Case to Chapter 7 of the Bankruptcy Code on November 5, 2015 (the "Conversion Order").[2] The Court took its Order to Show Cause under advisement.[3] This Memorandum Opinion sets forth the Court's findings of

---

[1] All further references to the Bankruptcy Code are to the Bankruptcy Code as codified at 11 U.S.C. §§ 101 *et seq.*

[2] Order Granting Motion to Convert Case to Chapter 7, *In re Mark F. White and Nnika E. White*, No. 14-36232 (Bankr. E.D. Va. Nov. 5, 2015), ECF No. 78.

[3] At the time of the November Hearing White had a Virginia State Bar Disciplinary proceeding pending against her. This matter has since been concluded. *See infra* note 6. The Court's Order to Show Cause remains under advisement, however, pending resolution of the case *In re Tamara Crews* (Case No. 14-35243-KLP). *See infra* note 12.

fact and conclusions of law supporting the Conversion Order in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[4]

## Jurisdiction and Venue

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1408.

## Procedural Posture

On November 19, 2014 (the "Petition Date"), Debtors Nnika E. White and Mark F. White (the "Debtors"), by and through counsel,[5] filed a joint voluntary petition under Chapter 13 of the Bankruptcy Code.  One of the assets identified in the schedules annexed to the voluntary petition was a 100% membership interest in The Law Offices of White & Associates, PLLC (the "White Law Firm").  The White Law Firm had a substantial bankruptcy practice, and its attorneys had appeared as counsel of record in many cases before this Court.  White practiced as an attorney at the White Law Firm.  Until quite recently, White was a member in good standing of the Bar of this Court.[6]  Mark F. White worked as a salaried employee for the White Law Firm.

---

[4] Federal Rule of Bankruptcy Procedure 7052 is made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.  *See* Fed. R. Bankr. P. 9014.  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

[5] The attorney who filed the bankruptcy petition and was counsel of record for the Debtors was employed as an associate at the White Law Firm (the "Associate Attorney").  In that capacity, the Associate Attorney worked for and reported to White.  The Associate Attorney left the White Law Firm while this case was pending and is now practicing law with another unrelated firm.

[6] On November 23, 2015, the Virginia State Bar suspended the law license of White for a period of three years.  By Order entered November 25, 2015, White was removed as a member of the Bar of this Court in accordance with Local Rule 2090-1.  *See* Amended Order, *In re White*, No. 15-00303 (Bankr. E.D. Va. Nov. 30, 2015), ECF No. 4.  White continues to represent herself *pro se* in this bankruptcy case.  The Court is not aware whether Mark F. White has engaged new counsel to represent him.

On December 11, 2014, the Debtors filed their initial Chapter 13 plan (the "Initial Plan").[7] A confirmation hearing was scheduled for January 21, 2015. Suzanne E. Wade (the "Chapter 13 Trustee") filed a timely objection to confirmation of the Initial Plan (the "First Objection"). The Chapter 13 Trustee alleged that the Initial Plan was not filed in good faith. The Debtors had failed to provide to the Chapter 13 Trustee copies of their personal and business income tax returns for the three year period immediately preceding the Petition Date as they were requested to do at the Debtors' § 341 meeting of creditors on December 18, 2014. *See* 11 U.S.C. § 521.[8] The January 21, 2015 confirmation hearing and the hearing on the Chapter 13 Trustee's First Objection were continued by agreement to February 18, 2015. The February 18, 2015 hearings were further continued by agreement to March 18, 2015.

On March 18, 2015, the First Objection was sustained by agreement, and the Court entered an order denying confirmation of the Initial Plan.[9] On April 7, 2015, the Debtors filed a Second Amended Chapter 13 Plan (the "Second Amended Plan"). On May 6, 2015, Nationstar Mortgage, LLC, servicer for U.S. Bank National Association, filed an objection to the Second Amended Plan (the "Nationstar Objection"). On the same day, the Office of the United States Trustee (the "U.S. Trustee") filed a limited objection to the Second Amended Plan, alleging concerns with the accuracy of the disclosures in the Debtors' schedules (the "U.S. Trustee

---

[7] The Debtors were required under the Local Rules to file their plan by the end of the day on December 3, 2014. *See* Local Bankruptcy Rule 1007-1, 3015-2(c). The Debtors filed a motion to extend the time period for filing their plan, which was granted by the Court. The Initial Plan that was filed on December 11, 2014, provided for a 5% dividend to be distributed to the Debtors' unsecured creditors over a period of 42 months.

[8] Section 521 of the Bankruptcy code sets forth the duties of a debtor (such as the duty to cooperate with the trustee) applicable to all chapters of the Bankruptcy Code, including Chapter 13. Generally, debtors in Chapter 13 are expected to apply all of their projected disposable income during the applicable commitment period to the repayment of their unsecured creditors. The Chapter 13 Trustee requires historical financial records such as pre-petition tax returns and payment advises in order to compute "projected disposable income," as that term is defined by the Bankruptcy Code. *See* 11 U.S.C. § 1325(b)(2).

[9] Unsecured creditors holding allowed claims in a Chapter 13 case do not receive any payments from the trustee in the case until a plan has been confirmed. *See* Fed. R. Bankr. P. 3021. Accordingly, a high premium is placed upon early confirmation of Chapter 13 plans. This proved to be a frustrated expectation in this case.

Objection" and together with the Nationstar Objection, the "Second Objections"). The Second Objections were rendered moot when the Debtors filed a Third Amended Chapter 13 Plan on June 9, 2015 (the "Third Amended Plan").

On June 15, 2015, White filed a motion in her capacity as legal counsel requesting leave to substitute herself as attorney of record for the Debtors in the stead of the Associate Attorney who had originally filed the case on the Debtors' behalf.[10] On July 8, 2015, the Court granted that motion and entered an order substituting White as counsel for the Debtors and authorizing the Associate Attorney to withdraw from the case.

On July 15, 2015, the U.S. Trustee filed an objection to confirmation of the Debtors' Third Amended Plan (the "Third Objection"). A hearing on the Third Objection was set for July 22, 2015 and later continued to September 2, 2015.[11] At the hearing conducted on September 2, 2015, White (who was now representing the Debtors) requested the Court for a further adjournment of the hearing to October 14, 2015. The U.S. Trustee explained to the Court that it would agree to the requested continuance as it had just been informed about a substantial post-petition payment that had only recently been made from the operating account of the White Law Firm. The U.S. Trustee desired an opportunity to investigate the circumstances surrounding that post-petition payment which reportedly had been made to one of White's clients. The Court was very reluctant to continue the confirmation hearing yet again, but noting the serious nature of the investigation into any such post-petition payment, agreed to do so.[12] The Court advised the

---

[10] *See supra* note 5.

[11] By the time of the scheduled September 2, 2015 hearing, the Debtors' case had been pending for more than nine months. During that nine-month period, the Debtors had enjoyed the protection of the Court from their creditors. *See* 11 U.S.C. § 362(a). Yet, not a single payment had been made to the Debtors' creditors.

[12] The post-petition payment involved a check drawn on the operating account of the White Law Firm in the amount of $27,225.00 (the "Check"). The Check was made payable to the Chapter 13 Trustee in the bankruptcy case of Tamara Crews (the "2014 Crews Case" – case no. 14-35243-KLP). Tamara Crews was a client of White at the

4

parties that due to the inordinate delay that had already occurred in this bankruptcy case and given the gravamen of the ensuing investigation, the Court would not permit any further adjournments. The Court instructed the parties that it would conduct an evidentiary hearing on October 14, 2015.

On October 13, 2015, the Debtors filed a Fourth Amended Chapter 13 Plan (the "Fourth Amended Plan"). The Filing of the Forth Amended Plan was an attempted ploy to moot out the Third Objection. The Fourth Amended Plan purports to have been filed by the Associate Attorney who had originally served as counsel for the Debtors. The electronic signature of the Associate Attorney appears throughout the Fourth Amended Plan. Assuming that the filing of the Fourth Amended Plan obviated the need for the October 14 hearing, neither the Debtors nor White, in her capacity as counsel for the Debtors, appeared at the scheduled October 14 hearing.[13] The Associate Attorney did attend the October 14 hearing and testified under oath that she had not signed the Fourth Amended Plan, that her signature affixed to the Fourth Amended Plan was a forgery, and that she was not entering a new appearance in the case on behalf of the Debtors. On October 20, 2015, the Court issued its Order to Show Cause to

---

White Law Firm. White had filed a previous Chapter 13 bankruptcy case for Tamara Crews in 2012 (the "2012 Crews Case" – case no. 12-31264-KLP). While the 2012 Crews Case was pending, Tamara Crews inherited $50,074.58. The inheritance was property of the Tamara Crews bankruptcy estate. *See Carroll v. Logan*, 735 F.3d 147 (4th Cir. 2015) (holding post-petition inheritance received before a Chapter 13 case is closed is property of the bankruptcy estate pursuant to 11 U.S.C. § 1306 and should be used to repay creditors). Rather than disclose the inheritance to the Chapter 13 Trustee, White had the 2012 Crews Case dismissed. White proceeded to deposit the $50,074.58 inheritance into her trust account for Tamara Crews. Although White had not been scheduled as a creditor by Tamara Crews in the 2012 Crews Case, White immediately disbursed $33,490 to herself as payment for outstanding legal fees. White then filed the 2014 Crews Case, again under Chapter 13. After the U.S. Trustee began investigating White for the failure to disclose the inheritance and after the Virginia State Bar began investigating White for irregularities in her trust account, White wrote the Check to the Chapter 13 Trustee in the 2014 Crews Case. This was an apparent attempt to correct "the problem." Questions remain whether the post-petition payment is property of White's bankruptcy estate or that of the 2014 Crews Case.

[13] Local Rule 2090-1(H) requires counsel of record to be present and appear at all court proceedings involved in the bankruptcy case.

5

White.[14] Also, on October 20, the Chapter 13 Trustee filed her Motion to convert the Debtors' bankruptcy case from Chapter 13 to one under Chapter 7. The Court set the Chapter 13 Trustee's Motion to Convert and the Court's Order to Show Cause over to the November Hearing.

On October 29, 2015 the Debtors filed a Fifth Amended Chapter 13 Plan (the "Fifth Amended Plan"). The Fifth Amended Plan removed the electronic signature of the Associate Attorney and replaced her signature with that of White in her capacity as counsel for the Debtors. As of the November Hearing, the Debtors' bankruptcy case had been pending for nearly a year. Five Chapter 13 Plans had been proposed. None of those plans had been confirmed. Not a single payment had been distributed by the Chapter 13 Trustee to the Debtors' creditors.

**Evidentiary Hearing**

Two witnesses testified at the November Hearing. White testified on her own behalf. A bankruptcy analyst employed by the U.S. Trustee, who had examined the Debtors' books and records and had investigated their financial affairs, was qualified as an expert forensic bankruptcy accountant under Federal Rule of Evidence 702 and testified on behalf of the Chapter 13 Trustee (the "Bankruptcy Analyst"). The Bankruptcy Analyst testified that the Debtors appeared to own the White Law Firm and had scheduled it as a joint asset on their bankruptcy schedules with a value of $0.00.[15] White was a salaried attorney at the White Law Firm. Mark

---

[14] Specifically the Court's Order to Show Cause directed White to appear before the Court and show cause why she should not be sanctioned for failing to appear at the October 14, 2015, hearing, for violating Rules 5005(a) and 9011 of the Federal Rules of Bankruptcy Procedure, for violating Local Bankruptcy Rule 5001-5, for violating the Court's Case Management/Electronic Case File Policy, and for violating 11 U.S.C. § 526. Order to Show Cause, *In re Mark F. White and Nnika E. White*, No. 14-36232 (Bankr. E.D. Va. Oct. 20, 2015), ECF No. 68.

[15] It is unclear who owns the White Law Firm from the Debtors' schedules. The Debtors' Schedule B indicates that the White Law firm is jointly owned by the Debtors. However, the Debtors' Schedule I lists White as "Owner" and Mark F. White as "Office manager." As Mark F. White is not a licensed attorney, it would be a violation of Rule 5.4 of the Virginia Rules of Professional Conduct for him to have an ownership interest in the White Law Firm. *See Rule 5.4 of the Virginia Rules of Professional Conduct* ("A lawyer shall not practice with or in the form of a

6

F. White was employed as its office manager. The Bankruptcy Analyst determined that the Debtors had substantially under-reported the income of the White Law Firm by using its operating account for the payment of personal expenses that were wholly unrelated to the operation of the law firm. On its most recent tax return, the White Law Firm reported a net profit of only $2,200.

The Bankruptcy Analyst testified that the general ledger of the White Law Firm listed a large number of expenditures attributed to an American Express account in the name of the White Law Firm. A substantial amount of the White Law Firm's expenses flowed through the American Express account. Although the general ledger listed all of the charges to this American Express account, it failed to detail for what the charges had been expended. This could only be accomplished by obtaining the billing records from American Express and comparing the charges to the expenditures listed in the general ledger. This analysis revealed that a significant number of the American Express charges were unrelated to the operation of the White Law Firm. The American Express card was being used to pay for many of the Debtors' personal expenses including: entertainment expenses, daily meals, personal clothing, mortgage payments, and tuition for the Debtors' children.[16] The White Law Firm paid all of these charges that were made to its American Express account and reported them as ordinary business expenses. The Bankruptcy Analyst noted that other personal expenses of the Debtors had been paid directly from the operating account of the White Law Firm and had been expensed in the

---

professional corporation or association authorized to practice law for a profit, if: (1) a non lawyer owns any interest therein . . . .").

[16] The Debtors argue that the majority of the meal expenditures were legitimate business expenses because they were incurred for the benefit of the employees of the White Law Firm. White testified that the law firm often provided multiple meals for employees and often bought meals on weekends for staff. However, the Debtors provided the Court with no corroborating evidence to support this assertion. Nevertheless, the credit card records show dozens of charges that are obviously personal in nature and wholly unrelated to the operation of any law firm.

same fashion. The Bankruptcy Analyst's review of the Debtors' personal financial records disclosed a corresponding absence of any meaningful financial activity in the Debtors' personal bank accounts. These facts led the analyst to conclude that the Debtors relied on the White Law Firm operating account and American Express credit card to fund their day-to-day personal activities. The practice of reporting personal expenses as ordinary operating expenses of the law firm caused the income of the White Law Firm to be substantially understated.[17]

Debtors filing for protection under Chapter 13 of the Bankruptcy Code are required to formulate and submit for court approval a plan under which they agree to pay to creditors all of their "disposable income" for a period of three to five years. 11 U.S.C. § 1325(b).[18] The deceptive practice of reporting personal expenses as ordinary operating expenses of the law firm skewed the calculation of the Debtors' "disposable income" under § 1325(b) of the Bankruptcy Code. The Debtors' Initial Plan proposed a 5% payout to unsecured creditors.[19] The Debtors reported on Official Form B22C that their "annualized current monthly income" was $90,000, which figure was below the applicable median family income for a family of the Debtors' size in Virginia.[20] This critical calculation meant that the Debtors' "disposable income" was not

---

[17] *See supra* note 8.

[18] Section 1325 of the Bankruptcy Code governs confirmation of a debtor's Chapter 13 plan. Section 1325(b)(1) prohibits the Court from confirming a plan over the objection of the trustee or a holder of an allowed unsecured claim unless:

    (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
    (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

[19] Because the unsecured creditors were not going to be paid in full under the Debtors' Initial Plan, the Debtors were required to commit all of their projected disposable income throughout the applicable commitment period to the repayment effort. Section 1325(b) sets forth detailed definitions under which (i) the determination of the applicable commitment period and (ii) the calculation of disposable income are to be made.

[20] Section 101(10A) of the Bankruptcy Code defines "current monthly income" as the average monthly income derived by the debtors from all sources during the six-month period preceding the date of the petition. Debtors are

8

determined under § 1325(b)(3) and was instead determined by the Debtors' schedules I and J.[21] It also meant that the length of the Debtor's plan, the "applicable commitment period," could be as little as three years under § 1325(b)(4) of the Bankruptcy Code.[22]  As the White Law Firm routinely paid the Debtors' personal expenses, the Debtors' actual income far exceeded their reported, combined yearly salary of $90,000.  The Bankruptcy Analyst estimated that, once the Debtors' personal expenses for which the White Law Firm was paying were included in the calculus, the Debtors' income ballooned to approximately $280,000 per year.

White testified at the November Hearing that this disparity was of no moment, as the Debtors' Fifth Amended Plan eventually proposed to pay unsecured creditors 100% of their allowed claims for a total payout to creditors of $120,720.  But this plan was proposed only after the First Objection to confirmation filed by the Chapter 13 Trustee had been sustained and only after the Court had denied confirmation of the Initial Plan.  It is disingenuous for the Debtors to argue that they began to proceed properly and in good faith after their first attempted "low ball" bid proved unsuccessful because it was challenged by the Chapter 13 Trustee.

But even then, the Debtors gamed the system.  For a creditor to participate in a distribution under a confirmed plan in a Chapter 13 Bankruptcy case, the creditor must have an

---

required to file Official Form B22C to reflect the statutory calculation of current monthly income.  *See* Fed. R. Bankr. P. 1007(b)(6).  "Annualized current monthly income" is derived by multiplying "current monthly income" by twelve at line 21 of the Official Form.

[21] Disposable income is defined as "current monthly income received by the debtor . . . less amounts reasonably necessary to be expended." 11 U.S.C. § 1325(b)(2).  If the calculation of the Debtors' annualized current monthly income had exceeded the median income for a family of the Debtors' size in Virginia, then the Bankruptcy Code instructs that "amounts reasonably necessary to be expended" must be calculated in accordance with the means test set forth in § 707(b)(3) of the Bankruptcy Code.  11 U.S.C. § 1325(b)(2).  *See In re Johnson*, 346 B.R. 256, 264 (Bankr. S.D. Ga. 2006) ("Section 1325(b) now requires above-median-income debtors to calculate their 'reasonable necessary expenses' according to the mathematical formula at § 707(b)(2).").  The Debtors avoided this inconvenient mandate by under-reporting their income.

[22] Part II of Official Form B22C is designed to calculate the applicable commitment period for a debtor's plan.  The "applicable commitment period" cannot be less than five years for debtors whose annualized current monthly income when multiplied by twelve exceeds the state median income.

9

allowed claim. To obtain an allowed claim, a creditor is required to file a proof of claim with the Court. Fed. R. Bankr. P. 3002. The Bankruptcy Rules set a bar date for filing proofs of claim. *Id.* That date is 90 days after the § 341 meeting of creditors. *Id.* This Court has previously held that all creditors are bound by the 90-day deadline, and the bar date cannot be extended in the absence of a specific exception. *See In re Nwonwu*, 362 B.R. 705, 707-08 (Bankr. E.D. Va. 2007).[23] A Chapter 13 debtor is required to file a Chapter 13 plan within 14 days following the Petition Date. Fed. R. Bankr. P. 3015(b). Creditors rely on the provisions of the proposed Chapter 13 plan in making their determination whether to participate in the bankruptcy process. A creditor may decide not to file a proof of claim if its participation cost calculation exceeds the likely distribution it might receive under a debtor's Chapter 13 plan.

The proposed funding under the Debtors' Initial Plan was not intended to encourage creditor participation.[24] The Debtors waited to file an amended Chapter 13 plan that proposed to pay unsecured creditors 100% of their allowed claims until *after* the claims bar date had passed. At the November Hearing, the U.S. Trustee referred to this practice as "test[ing] the claims pool." By all accounts the Debtors succeeded in reducing the aggregate amount of the allowed claims filed in their Chapter 13 case. Allowed unsecured claims amounted to less than 40% of the Debtors' scheduled unsecured debt.[25]

---

[23] "The requirement of a Bar Date in Chapter 11 enables the debtor . . . to establish the universe of claims with which it must deal and the amount of those claims." *In re A.H. Robins Co. Inc.*, 129 B.R. 457, 459 (Bankr. E.D. Va. 1991).

[24] Indeed White admitted as much when she testified that the Debtors were waiting to see whether the lender holding the second priority lien position on their home chose to file a proof of claim.

[25] The Debtors' Second Amended Plan, to which White was apparently referring at the November Hearing, shows scheduled non-priority unsecured debt totaling $322,116 at the bottom of the first page. The proposed plan funding amount set forth in paragraph 1 of the plan that was necessary to pay 100% of the allowed claims, as represented in paragraph 4 of the plan, was $120,720, which was 37% of the amount shown as scheduled. The Court notes that the percentage of scheduled non-priority unsecured debt proposed to be paid under the Fifth Amended Plan increased to 39%.

The evidence further demonstrated that the Debtors failed to maintain their plan payments under the terms of the various amended plans they proposed.[26] As the Debtors neglected their plan payments and fell behind to the Chapter 13 Trustee, they engaged in a scheme to file amended plans that succeeded in curing their arrearages (not through any actual payment), but by adopting new provisions calling for lower initial monthly payments with the promise of larger payments down the road. All of the Debtors' plans have provided for a payment scheme whereunder the Debtors propose to pay a relatively small monthly amount to the Chapter 13 Trustee for the first few months of the plan before the payments "step-up" and significantly increase for the remaining term of the plan. For example, the Second Amended Plan called for monthly payments of $500 for six months and then monthly payments of $2,180 for the remaining plan period. The Third Amended Plan called for monthly payments of $333.33 for six months (thus curing several missed $500 payments under the Second Amended Plan), followed by monthly payments of $500 for three months, and then monthly payments of $2,663 for fifty-one months. The Fifth Amended Plan called for monthly payments of $386.36 for eleven months followed by monthly payments of $2,756 for forty-nine months. As of the time of the November Hearing, the Debtors had paid only $4,250 to the Chapter 13 Trustee over the first ten months of the case.[27] Manipulating the Bankruptcy process in this manner by constantly

---

[26] Section 1326(a) of the Bankruptcy Code requires debtors to commence making plan payments within 30 days of filing a proposed plan in the amount set forth therein. 11 U.S.C. § 1326(a). Such payments are retained by the Chapter 13 Trustee until confirmation, when they may then be disbursed to creditors holding allowed claims in accordance with the plan. 11 U.S.C. § 1326(b).

[27] Under the terms of the Second Amended Plan, the Debtors would have been required to pay $13,900 to the Chapter 13 Trustee as of the time of the November Hearing. Under the terms of the Third and Fourth Amended Plans the Debtors would have been required to pay $8,825.98 to the Chapter 13 Trustee as of the time of the November Hearing. The Court finds that the Fifth Amended Plan was filed for the purpose of further delaying plan payments to the Chapter 13 Trustee.

11

amending plans in order to reduce plan payments to the Chapter 13 Trustee is the epitome of unreasonable delay and constitutes bad faith.

## Analysis

The Chapter 13 Trustee sought to convert the Debtors' case to Chapter 7 under § 1307 of the Bankruptcy Code. Section 1307 provides that "on request of a party in interest or the United States Trustee and after notice and a hearing the court may convert a case under this chapter to a case under chapter 7 of this title . . . for cause including – (1) unreasonable delay by the debtor that is prejudicial to creditors . . . ." 11 U.S.C. § 1307(c).[28] The statute provides a list of other factors that may constitute "cause" under section 1307(c) including the failure to timely file a Chapter 13 plan and the failure to commence timely payments. *Id.*

The list of factors constituting "cause" is not exhaustive. *See In re Kestell*, 99 F.3d 146, 148 (4th Cir. 1996). A finding of "bad faith" can be cause for conversion under section 1307(c). *See Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 379 (2007); *In re Kestell*, 99 F.3d at 148 (citing *In re Love*, 957 F.2d 1350 (7th Cir. 1992)); *In re Mitrano*, 472 B.R. 706, 709 (E.D. Va. 2012); *In re Uzaldin*, 418 B.R. 166, 173 (Bankr. E.D. Va. 2009). Courts use the "totality of the circumstances" test when determining whether to convert a case under section 1307(c). *See In re Love*, 957 F.2d at 1354-55; *In re Herndon*, 218 B.R. 821, 824 (E.D. Va. 1998); *In re Maroney*, 330 B.R. 527, 531 (Bankr. E.D. Va. 2005). The burden of proof under § 1307(c) of the Bankruptcy Code rests with the moving party. *See In re Love*, 957 F.2d at 1355. "The object of the inquiry is to determine whether or not, considering 'all militating factors' there has been 'an abuse of the provision, purpose or spirit' of Chapter 13." *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986) (citing *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982) (considering good

---

[28] The Chapter 13 Trustee is a "party in interest" under § 1307(c). *See, e.g.*, *In re Forte*, 2007 WL 2028894 at *4 (Bankr. E.D. Pa. July 6, 2007); *In re Faaland*, 37 B.R. 407, 409 (Bankr. D.N.D. 1984); *In re Kelsey*, 6 B.R. 114, 116 (Bankr. S.D. Tex. 1980).

12

faith under §1325(a))); *see In re Herndon*, 218 B.R. at 824 (applying the § 1325(a) analysis in *Neufeld* to § 1307(c)). The Fourth Circuit has articulated factors a court can use to determine whether a Chapter 13 Plan is proposed in good faith under § 1325(a)(3). *See Deans*, 692 F.2d at 972. Such factors can be instructive for this Court's analysis under § 1307(c) and include the debtor's financial situation, the proposed payment to creditors, the debtor's employment history and prospects, the nature and amount of unsecured claims, and the debtor's honesty in representing facts. *Id.*

Considering the evidence before it and the totality of the circumstances, the Court finds that the Debtors have engaged in unreasonable delay and bad faith throughout their Chapter 13 case. The Debtors have proactively abused the provisions of the Bankruptcy Code and have hijacked the bankruptcy process to the detriment of their creditors. The Court finds that White, who was until recently a longstanding member of the Bar of this Court, used her familiarity with the Chapter 13 bankruptcy process to manipulate the system by taking full advantage of the protections the Bankruptcy Code offers to debtors but (at the same time) avoiding performance of the obligations the Bankruptcy Code imposes upon debtors. This was accomplished through proposing a seemingly endless series of failed plans, through filing fraudulent schedules that purposefully understated disposable income and devalued assets, and through delaying distribution of any payment to creditors for almost a year.

The Debtors argue that because their Fifth Amended Plan (which was filed just a few days before the November Hearing) proposes a 100% payout to unsecured creditors, it is in the best interest of creditors for the Debtors to remain in Chapter 13. Section 1307 is clear that "the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter whichever is in the best interest of creditors and the estate for

13

cause . . . ." 11 U.S.C. § 1307(c).  The Court is not required by § 1307(c) to weigh the interests of creditors in its cause determination analysis.  The best interest of creditors is considered by the Court only after cause has been established.  The Court must weigh what is in the best interest of creditors in deciding between conversion and dismissal of the case.  *See id.*  The Court finds that cause under § 1307(c) exists in this case due to the Debtors' bad faith manipulation of the bankruptcy process and from the ensuing unreasonable delay resulting therefrom.  The Court finds further that, given the Debtors' egregious conduct, it is in the best interest of the creditors that this case be converted to a case under Chapter 7 and not merely dismissed.

The filing of the Fourth Amended Plan presents its own cause for conversion of this Chapter 13 case.  The Court reluctantly agreed to continue the September 2 hearing on the Third Objection filed by the U.S. Trustee to the Debtors' Third Amended Plan.  The Court made clear that it would proceed with an evidentiary hearing on October 14, 2015 and that there would be no further delay.  It appears to the Court that the only reason the Debtors filed the Fourth Amended Plan was to render the Third Objection to the Third Amended Plan moot, obviate the need for the October 14 hearing, and thereby continue the pattern of delay that has permeated this case.  However, the October 14 hearing revealed issues with the Fourth Amended Plan that were even more troubling than the delay that it caused.[29]  The Fourth Amended Plan was purportedly filed by the Associate Attorney.  The plan was filed over the electronic signature of the Associate Attorney and under her bar number.  *See In re Wenk*, 296 B.R. 719, 725 n. 6 ("In electronically filed cases the "/s/" followed by a full typewritten name (e.g., /s/Jane Doe)

---

[29] The Fourth Amended Plan was filed through the Court's Case Management/Electronic Case Files (CM/ECF) system. All petition pleading or other documents filed with the Court must be filed through the CM/ECF system as provided by the *Court's Electronic Case Files Policy* (CM/ECF Policy).  *See* Local Bankruptcy Rule 5005-2.

'constitutes that person's signature under FBRP [sic] 9011 and LBR 5005-1(C)(4).'") (quoting CM/ECF Policy at 15).

At the October 14 hearing, the Associate Attorney disavowed any involvement with the Debtors' Fourth Amended Plan. She had remained entirely uninvolved in the Debtors' case once she had withdrawn. White later admitted that she had in fact filed the Fourth Amended Plan on behalf of the Debtors. White blamed the errant filing on a computer problem with her bankruptcy software which inadvertently "placed" the Associate Attorney's electronic signature on the plan.

Judge Tice of this Court has previously expounded on the consequences of fixing electronic signatures to documents filed through the CM/ECF system. *See In re Wenk*, 296 B.R at 725 ("The court must consider that Kane's action of filing a petition electronically purporting to have debtor's signature is no different than Kane physically forging debtor's signature and handing the petition over the counter to the clerk."). "When an attorney files a document purportedly containing the debtor's signature, he is representing to the court that he has secured the original executed document prior to it being electronically filed." *In re Smith*, No. 13-31565-KLP, 2014 WL 128385 at *4 (Bankr. E.D. Va. Jan. 14, 2014) (citing *In re Wenk*, 296 B.R. at 725). This Court has been very clear from the early days of the implementation of the CM/ECF system that it would treat electronic signatures no different than wet signatures, and that counsel must be careful when electronically submitting documents to the Court.

The principles spelled out by this Court in *Wenk* and *Smith* apply to this case. When White affixed the signature of the Associate Attorney to the Fourth Amended Plan, White represented to the Court that the Associate Attorney had executed the plan, that the Associate Attorney was representing the information contained in the Fourth Amended Plan was true and

accurate, and that the Associate Attorney was not filing the Fourth Amended Plan for any improper purpose.[30] *See In re Smith*, 2014 WL 128385 at *5. White committed forgery when she affixed the Associate Attorney's electronic signature to the Fourth Amended Plan. Obviously, the Court could not confirm an amended plan with a forged signature. Nevertheless, the forgery enabled the Debtors to perpetuate the pattern of delay they had fostered in this case. The delay prejudiced the Debtors' creditors. Meanwhile, the Debtors took full advantage of the "computer problem." The Clerk's Office issued electronic notice of the apparent deficiency on October 15, 2015.[31] Given the immediate opportunity to rectify the situation that the receipt of the electronic notice afforded, the Debtors nevertheless took over two weeks to correct the "computer problem."

**Conclusion**

For the forgoing reasons, the Court finds that the Debtors have not proceeded in a good faith effort to repay their creditors. The Debtors have manipulated the bankruptcy process in an effort to frustrate their creditors. The Court finds that the Debtors have unreasonably delayed the administration of this case to their creditors' prejudice. The Debtors have proposed five different plans, all of which have had serious deficiencies. The Debtors' case has been pending for almost a year without a single one of the Debtors' Chapter 13 plans being confirmed. This has resulted in not a single payment being distributed by the Chapter 13 Trustee to the Debtors' creditors.

The evidence is clear that the Debtors filed their Initial Plan with an intent to discourage creditors from filing claims in their case. Nearly 25% of the total funding in the Initial Plan was slated for payment to the Debtors' White Law Firm as "attorney's fees." The evidence

---

[30] *See* Fed. R. Bankr. P. 9011(b) ("By presenting to the court . . . a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying . . . it is not being presented for any improper purpose . . . .").

[31] Notice of Deficient Filing, *In re Mark F. White and Nnika E. White*, No. 14-36232 (Bankr. E.D. Va. Oct. 15, 2015), ECF No. 67.

16

demonstrates that the Debtors consistently and purposefully understated their income and that of the White Law Firm by expensing their personal obligations. None of the series of plans filed in this case ever had a hope of being confirmed or completed. The Debtors neglected to stay current even on the smaller monthly plan payments they manipulated paying throughout the life of this Chapter 13 case. The plan amendments that the Debtors did propose were merely offered to moot plan objections, cancel confirmation hearings, and cause inordinate delay. The Fourth Amended Plan was a forgery that had no hope of being confirmed. Under these circumstances, the Court decided to convert this case to one under Chapter 7 of the Bankruptcy Code in order to protect the best interests of the Debtors' creditors. Accordingly, it entered its Conversion Order on November 5, 2015.

Entered: __Dec 10 2015_____

                                                _____/s/ Kevin R. Huennekens_____
                                                UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: Dec 10 2015